UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH DELONG | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) CIVIL ACTION |
| | ) NO. 05-11334-WGY |
| BERNARD BRADY, | ) |
| Superintendent of the MCI Cedar | ) |
| Junction Correctional Center | ) |
| | ) |
| Respondent. | ) |
| | ) |
| | ) |

MEMORANDUM AND ORDER

YOUNG, D.J.                                        July 14, 2010

## I.  INTRODUCTION

Joseph DeLong, acting pro se, filed this petition for a writ
of habeas corpus pursuant to Section 2254 of Title 28 of the
United States Code.  DeLong seeks to vacate his conviction for
Armed Robbery under Massachusetts General Laws Chapter 265
Section 17.1, for which he was sentenced to ten to fifteen years
in prison.

DeLong alleges that the Massachusetts Appeals Court erred by
upholding the Superior Court's decision to admit prior bad acts
evidence.  Delong Mem. in Supp. of App. for Writ of Habeas Corpus
("DeLong Mem.") at 32-33 [Doc. No. 30].  DeLong claims that
admission of the prior bad acts evidence violated his due process
rights under the Fourteenth Amendment and his right to a fair
trial under the Sixth Amendment.  Id.

DeLong also claims he was denied effective assistance of counsel in violation of the Sixth Amendment. DeLong Mem. at 41. Specifically, DeLong claims that trial counsel failed to: (1) suppress incriminating evidence obtained from his motor vehicle after his arrest (Count B-1); (2) present additional alibi witnesses (Count B-2); (3) challenge police testimony concerning the identification of DeLong by an out-of-court witness (Count B-3); (4) object to the jury instruction regarding witness identification testimony (Count B-4); (5) pursue certain defense strategies (Counts B-5, 6, 7, 9, 10);[1] and (6) suppress identifications of DeLong made through an "unfair" photographic array (Count B-8).[2] DeLong Mem. at 42-121.

Respondent Bernard Brady, the superintendent of the MCI-Cedar Junction Correctional Center at Walpole where Delong is presently incarcerated,[3] argues that DeLong's prior bad act

---

[1] The defense strategies DeLong alleges his trial counsel failed to pursue are: (1) failure to investigate or fully exploit deficiencies in the identification testimony of Aleika Lewis; (2) failure to secure a transcript from DeLong's earlier armed robbery trial in order to impeach witnesses; (3) failure to object to the testimony of Detective Anderson, who identified DeLong from still photographs taken from surveillance videotape; (4) failure to investigate or refute evidence pertaining to travel times presented by the Commonwealth; and (5) failure to move to dismiss DeLong's indictment based on the presentation of prejudicial evidence to the Grand Jury. DeLong Mem. at 74-102, 109-21.

[2] The ineffective assistance of counsel claims were raised separately in each of DeLong's appeals. Counts B-1 and B-2 were raised in his appeal from the denial of his motion for a new trial; Counts B-3 through 10 were raised in his direct appeal.

[3] DeLong initially brought his habeas petition against Thomas Dickhaut, Superintendent of the Souza-Baranowski Correctional Center in Shirley, Massachusetts.

evidentiary claims ought be denied because they allege an error
of state law not cognizable on habeas review.  Brady Mem. in Opp.
to Pet. for Writ of Habeas Corpus ("Brady Mem.") at 1 [Doc. No.
32].  Brady argues that DeLong's ineffective assistance of
counsel claims ought be denied because the Massachusetts Appeals
Court's decision on these claims was not contrary to, or an
unreasonable application of, clearly established Supreme Court
precedent.  Id. at 2.

     **A.  Procedural Posture**

     DeLong was indicted by a Massachusetts grand jury for armed
robbery and tried between August 19 and 25, 1999.  DeLong Mem. at
1-2.  The jury returned a guilty verdict and DeLong timely filed
an appeal on September 21, 1999.  Id. at 2.  DeLong filed a post-
verdict motion for a new trial which was denied on May 30, 2003.
Id.  DeLong filed a notice of appeal from this denial of a new
trial on June 18, 2003.  Id.  On June 26, 2003, the Appeals Court
consolidated DeLong's appeal of the denial of his motion for a
new trial and his direct appeal.  Id.  On appeal, DeLong argued
that: (1) the trial court erred in admitting prior bad acts
evidence; (2) the probative value of the prior bad acts was not
outweighed by their potential for unfair prejudice; (3) his
counsel was ineffective in failing to move to suppress evidence
the police obtained from Delong's car on the basis of improper
impoundment; and (4) his counsel was ineffective for failing to
secure the testimony of two alibi witnesses.  See Commonwealth v.
DeLong, 60 Mass. App. Ct. 528, 533-38 (2004) ("DeLong I").  On

February 26, 2004, the Massachusetts Appeals Court affirmed DeLong's conviction.  Id. at 538.

DeLong claims that on or about June 28, 2005, he filed a second motion for a new trial in Massachusetts Superior Court, Suffolk County.  DeLong Mem. at 2.   The motion and accompanying affidavits and memorandum of law, however, were never docketed. Id.  On or about June 26, 2006, DeLong mailed a second motion for a new trial with accompanying documentation.  Id.  This motion was docketed on July 11, 2006.  Id.

On July 12, 2006, Superior Court Justice Elizabeth Donovan denied DeLong's second motion for a new trial without a hearing, DeLong Mem. at 2, holding that the issues in DeLong's second motion were either advanced in his first motion for a new trial or could have been so advanced had DeLong's appellate counsel believed them meritorious, Brady Mem. at 3.   Justice Donovan also found there to be insufficient grounds to support DeLong's ineffective assistance of counsel claim in light of the overwhelming evidence on the issue of identification.  Id.

Delong timely filed a notice of appeal from this decision on July 20, 2006.  DeLong Mem. at 3.  On January 9, 2007, DeLong filed his first pro se brief with the Massachusetts Appeals Court, raising nine issues pertaining to the denial of his second motion for a new trial.  Brady Mem. at 3.  DeLong argued that the Superior Court erred in denying his motion for a new trial without a hearing.  Id.  DeLong also raised eight ineffective assistance of counsel claims, asserting that trial counsel failed

to: (1) investigate a government witness who allegedly
misidentified DeLong; (2) object to or appeal Justice Donovan's
jury instruction regarding an "honest but mistaken"
identification; (3) obtain prior trial transcripts for
impeachment; (4) challenge police testimony that a non-testifying
witness identified DeLong from a photo array; (5) challenge
police testimony that DeLong was depicted in a surveillance
video; (6) suppress identification of DeLong based on an
unreasonably suggestive photo array; (7) investigate or raise an
alibi defense at trial or on appeal; and (8) argue for dismissal
of the indictment.  See Commonwealth v. DeLong, 72 Mass. App. Ct.
42, 46-51 (2008) ("DeLong II").

On April 30, 2007, DeLong's appellate counsel filed a
supplemental brief raising the following three issues: (1)
admission of identification evidence from a non-testifying
witness violated DeLong's constitutional right of confrontation
under Crawford v. Washington, 541 U.S. 36 (2004); (2) trial
counsel failed to object to the admission of a non-testifying
witness's testimony; and, (3) trial counsel failed to object to
the omission from the jury charge of an "honest but mistaken"
instruction regarding identification.  Brady Mem. at 3-4.  On
June 13, 2008, the Massachusetts Appeals Court affirmed the
denial of DeLong's second motion for a new trial.  DeLong II, 72
Mass. App. Ct. at 51.[4]

---

[4] Brady lists this date as July 12, 2006.  Brady Mem. at 4.
This is an error.

DeLong and his counsel filed motions for further appellate review with the Massachusetts Supreme Judicial Court on July 2, 2008, and August 25, 2008, respectively. Brady Mem. at 4. The Supreme Judicial Court denied DeLong's request for further appellate review on October 2, 2008. Id.

On June 24, 2005, DeLong filed a petition for a writ of habeas corpus with this Court [Doc. No. 1]. On July 12, 2005, the Court administratively closed the case because DeLong's petition presented grounds not yet exhausted in the courts of the Commonwealth. DeLong's case was thus administratively closed on July 14, 2005. On October 27, 2008, DeLong moved to reopen his case, offering evidence that the Suffolk Superior Court had denied DeLong's application for further appellate review [Doc. No. 7]. On January 15, 2009, this Court allowed DeLong's motion to reopen his case. On March 6, 2009, the government moved to dismiss DeLong's habeas petition as time-barred [Doc No. 11]. On March 27, 2009, this Court allowed that motion and entered an order of dismissal [Doc. No. 13]. After timely applying for an extension of time, on April 27, 2009, DeLong filed an opposition to the government's motion to dismiss his petition as time-barred [Doc. No. 15]. On May 5, 2009, this Court treated DeLong's opposition as a motion for reconsideration of the dismissal, allowed it, and vacated its earlier order of dismissal. DeLong's case was therefore reopened on May 5, 2009.

B.   **Relevant Factual Background** [5]

1.   **The Robbery**

At approximately 10:00 a.m. on the morning of January 17, 1998, Kevin Beaton, an assistant service manager at the Star Market on Western Avenue in Brighton responded to a page from Richard LaMonica, a part-time service associate who was working in the small "money room" located behind the courtesy booth at the front of the store.  The page requested that someone pick up the cash that had been deposited from cash registers into a drop safe located at the front of the store, and to bring such cash to the money room for processing.  Beaton went to the safe, accompanied by Aleika Lewis, whom Beaton had asked to witness the pickup of the cash.  Beaton counted the money in the safe. Thereafter, he and Lewis walked to the courtesy booth.  On their way to the front of the store, a man whom Lewis had previously seen observing them approached Lewis and said, "[e]xcuse me." Lewis replied, "[j]ust a minute please.  I'll be right with you," and the man moved away.

A few minutes later, the man again approached Lewis and asked to speak to a manager.  Lewis attempted to page the store manager, but when he did not respond, she asked Beaton to talk to the man.  Beaton inquired as to whether he could help the man with anything.  In response, the man approached Beaton and said in a soft voice, "I have a .45 and this is a robbery.  I want you

---

[5]The facts describing the robbery and trial are drawn from <u>DeLong I</u>, 60 Mass. App. Ct. at 529-33.

to take me into the money room."  The man had his hands in his pockets and did not display a gun.

Beaton took the man into the courtesy booth and asked another service associate who was working there, Angela Wilson, to hand him the money that was in a drawer in the booth.  The man said he wanted the money in a bag.  Beaton complied, placing the money in a Ziploc bag.

The man then said to Beaton, "I want to go into the money room.  I want to get the pickups that you just brought in." Beaton took the man into the money room and told LaMonica that a robbery was occurring and he should do what he was told.  The man took approximately $3,000 from the safe and put it into a different bag.  He also asked about the pickups.  Beaton responded that the pickups had been put into the time lock portion of the safe and could not be retrieved for another ten minutes.  The man then told Beaton to take him to the front door of the store. Beaton acquiesced, and the man left.

Once police were on the scene, Beaton, Lewis, and LaMonica all described the individual who had robbed them to Boston Police Detective Paul Mahoney.  Each of them said that the man was a white male, approximately five feet ten inches in height, weighing approximately 190 to 200 pounds.  They told the Detective that the man was wearing a green pullover sweatshirt with a zipper and hood, dark sweatpants, a dark stocking cap, and sunglasses.  Beaton and Lewis also told Detective Mahoney that the robber had yellowish or "messed up" teeth with gaps in them.

8

A store security camera videotape also showed that the man had gaps in his teeth.

### 2.    **The Arrest**, **Impoundment, and Identification**

On January 19, 1998, two days after the Brighton robbery, Newton police officer Pedro Lopez, dressed in plain clothes, was assigned to conduct a security detail inside the Newtonville Star Market in Newton.  Sometime after 1:00 p.m., Officer Lopez noticed a man, later identified as DeLong, standing in line at the customer service desk.  DeLong seemed nervous and was wearing dark clothing, a knit hat, and dark sunglasses.  He appeared to Officer Lopez to match the description of the person who had robbed the Brighton Star Market two days earlier.

Officer Lopez observed DeLong take off his sunglasses and ask a customer service representative for a job application. After obtaining the job application, DeLong exited the store. Officer Lopez followed DeLong out of the store along a street outside and then around a corner onto another street.  Shortly after DeLong walked around the corner, he turned around and walked back towards Officer Lopez.  Officer Lopez identified himself as a police officer, told DeLong that he matched the description of someone with whom the police wanted to talk, and asked him if he would walk back to the store with him.  DeLong agreed and as they were doing so, they met up with Detective Nils Anderson of the Newton police department, who had been conducting a surveillance of the store, and also several other officers who had arrived at the scene.

DeLong gave his name to the officers but told them that his identification was located in his car, which was parked behind a laundromat a short distance away.  After obtaining DeLong's keys, Officer Lopez proceeded to the car and retrieved DeLong's identification.  Meanwhile, Detective Anderson noted the gaps in DeLong's lower teeth and ran a warrant check on his name. Subsequently, Detective Anderson arrested DeLong and transported him to the police station.  He also had DeLong's car impounded and towed to the Newton police garage.

In an inventory search of DeLong's car, the Newton police found tags for several of the items of clothing DeLong was wearing that day, including his sweatshirt and sunglasses.  They also found a department store receipt, showing payment was made with a credit card bearing DeLong's last name, indicating that the items had been purchased at 1:14 p.m., just forty minutes before Officer Lopez had stopped DeLong.

Shortly thereafter, a photographic array was assembled and shown to each of the witnesses to the Brighton robbery, including Beaton, Lewis, LaMonica, and Wilson.  Each of them independently identified DeLong as the person who had robbed the Brighton store.

### 3.   The Trial

At trial, Beaton, Lewis, and LaMonica, Detectives Mahoney and Anderson, and Officer Lopez all testified to the foregoing events.  The Commonwealth also called as witnesses Barbara Sarnie, a service representative employed at the Star Market in

the Chestnut Hill section of Newton, and Philip Ferrante, the manager of the Star Market in the Auburndale section of Newton.

Sarnie testified that at about 10:00 a.m. on the morning of January 14, 1998, a man wearing a black hooded-type hat with some sort of attached scarf wrapped around his mouth, dark sunglasses, a sweatshirt, and dark pants, had approached her at the courtesy booth of the Chestnut Hill store and stated, "[t]his is a robbery and I have a gun.  And I want all the money in your drawer."  In response to the man's demands, Sarnie testifed that she took money out of a drawer in the booth and placed it in a bag the man had given her, and the robber then turned around and walked out of the store.  Sarnie also testified that subsequently she was shown the same photographic array that had been shown to the witnesses to the Brighton robbery, and had identified DeLong as the person who had robbed her.

Ferrante testified that at about 8:50 p.m. on the evening of January 14, 1998, he had gone to the courtesy booth at the front of the Auburndale Star Market in response to a page by a clerk indicating that someone wanted to see him.  Ferrante further testified that as he approached the booth, he noticed a man standing there who was wearing dark sunglasses, a dark sweatshirt, and dark sweatpants.  Ferrante asked the man if he could help him and the man responded by asking him if he was the manager.  When Ferrante responded that he was, the man stated to him that he had a .45 in his sweatshirt and ordered Ferrante "to take [him] to the safe."  In response to this demand, Ferrante

took the man to the money room behind the courtesy desk and,
together with a clerk there, put money into a bag.  The man then
took the bag and left the store with Ferrante following him out.

Unlike Sarnie, Ferrante did not testify that he had been
shown a photographic array.  Nevertheless, he identified DeLong
at trial as the person who had robbed him and also testified that
he had previously made such an identification at a prior hearing.

The Commonwealth also called Nicholas Geannaris, a loss
prevention specialist employed by Star Market, to testify.
Geannaris identified a series of still photographs taken from a
videotape made by a security camera of the Brighton robbery which
were introduced in evidence, and also videotapes of the Chestnut
Hill and Auburndale robberies, as well as the incident occurring
at the Newtonville Star Market on January 19, 1998, which were
also introduced in evidence.  Geannaris also identified two
photographs taken from a videotape made by a security camera at
the Brighton store at about 8:15 p.m. on the evening of January
14, 1998, three days before the Brighton robbery, which were
introduced in evidence.  Although the photographs were "fuzzy in
appearance," Geannaris testified that they showed an individual
in the produce area of the Brighton store who appeared to be
dressed in dark clothing, a hood, and sunglasses, and who also
appeared to have the same physique as the individual shown in the
videotape of the Auburndale robbery occurring at 8:50 p.m. on the
evening of January 14, 1998.

12

Finally, the Commonwealth presented evidence that the Brighton Star Market was located only one and six-tenths miles from DeLong's home on Quimby Street in Brighton, and that the Chestnut Hill and Auburndale stores were located only a few miles from the Brighton store.

DeLong's defense was misidentification.  In addition to bringing out inconsistencies in the testimony of the Commonwealth's witnesses, he called several alibi witnesses. DeLong's mother, Nancy Blickenstall, his grandmother, Jeanette DeStasio, and his grandmother's long-time friend, Charles Russo, all testified that DeLong had been at his mother's house in Brighton at or about 10:00 a.m. on January 17, 1998, when the robbery of the Brighton store had occurred.  DeLong also called his wife, Ellen DeLong, who testified that she and DeLong had been at dinner at a Ground Round restaurant in Waltham on the evening of January 14, 1998, when the robbery of the Auburndale store had occurred, and had remained there until some time after 8:00 p.m.  Finally, DeLong called Steven Molineaux and John Ryan, both of whom testified that DeLong had been at work at a construction site in Boston on the morning of January 14, 1998, when the robbery of the Chestnut Hill store had occurred, and had remained there until approximately 10:00 a.m.

## II.  ANALYSIS

### A.    The AEDPA Standard for Habeas Review

Pursuant to 28 U.S.C. § 2254, a federal district court may issue a writ of Habeas Corpus on the grounds that the petitioner

is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted unless the adjudication of a petitioner's state law claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

For a state court decision to be contrary to clearly established law, it must "appl[y] a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confront[ ] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the precedent]." Williams v. Taylor, 529 U.S. 362, 405 (2000).

A federal district court may grant a habeas petition under the "unreasonable application" clause, if the state court correctly identifies the governing legal rule but "unreasonably applies it to the facts of the particular . . . case." Williams, 529 U.S. at 407. In deference to the state court, its application of the law must not merely be incorrect but "objectively unreasonable." Id. at 409. Moreover, the petitioner must both disprove the factual finding by clear and convincing evidence and demonstrate that the court's factual

14

determination was objectively unreasonable.   <u>Miller-El</u> v.
<u>Cockrell</u>, 537 U.S. 322, 341 (2003).

    **B.   Grounds Raised by the Petitioner**

        1.   Admission of Prior Bad Acts [6]

DeLong submits that the admission in evidence of the two
prior robberies, and the attempted robbery at the Newtonville
Star Market, each subject to separate indictments, was unduly
prejudicial and so substantially outweighed their probative value
that their admission pursuant to Massachusetts Guide to Evidence
sections 403 and 404(b) denied him due process of law in
violation of the Fourteenth Amendment.[7]   DeLong Mem. at 33.
Brady submits that DeLong's prior bad acts evidentiary claims
ought be denied because they allege an error of state law not
cognizable on habeas review.   Brady Mem. at 1.

Habeas relief cannot be granted merely because a state court
errs in its application of state law.   <u>Sanna</u> v. <u>Dipaolo,</u> 265 F.3d
1, 11 (1st Cir. 2001) (citing <u>Puleio</u> v. <u>Vose,</u> 830 F.2d 1197, 1204
(1st Cir. 1987)).   A state law or practice, however, that betrays
a fundamental principle of justice, offends the Due Process
Clause.   <u>Cooper</u> v. <u>Oklahoma,</u> 517 U.S. 348, 363-65 (1996).

---

[6] Because DeLong is proceeding pro se, he is held to a "less
stringent standard[ ]than formal pleadings drafted by lawyers"
and his petition is interpreted liberally.   <u>Haines</u> v. <u>Kerner</u>, 404
U.S. 519, 520 (1972).

[7] DeLong asserts both Sixth and Fourteenth Amendment claims,
but only presents a due process argument to this Court.   Thus,
this Court analyzes DeLong's evidentiary claims solely under a
due process paradigm.

Accordingly, a state court's error in applying a state rule can sometimes have constitutional implications, see, e.g., Chambers v. Mississippi, 410 U.S. 284, 302-03 (1973), that, in turn, may form a basis for federal habeas relief.  Sanna, 265 F.3d at 12.

DeLong's invocation of the Federal Rules of Evidence is somewhat of a stretch given that these Rules are inapplicable in state courts.  One may reason by analogy, however, that DeLong has been accorded due process of the law if the Superior Court's evidentiary rulings would pass muster under the cognate provisions of the Federal Rules of Evidence.  Pagan v. Dickhaut, 578 F. Supp. 2d 343, 350 (D. Mass. 2008).

Although the Federal Rules of Evidence preclude the introduction of prior bad acts to show character or propensity to commit a crime, such evidence is allowed for an other relevant purpose.  "[E]vidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct."  Huddleston v. United States, 485 U.S. 681, 685 (1988) (ruling that evidence of prior attempt to sell stolen goods admissible to show that defendant had knowledge he was selling stolen goods).

The Supreme Court in Huddleston acknowledged that admitting such evidence raises issues of undue prejudice.  Id. at 691.  The Court held, however, that such concerns could be minimized by ensuring that such evidence is admitted for a proper purpose, is

16

relevant, and that its probative value is not outweighed by its prejudicial effect.  Id.

Under Federal Rule of Evidence 404(b), evidence of prior bad acts may be admitted to show, among other things, identification.[8]  In Dowling v. United States, 493 U.S. 342 (1990), the Supreme Court held that testimony about a robbery (of which the defendant was acquitted) was admissible for the limited purpose of showing that the defendant knew another person involved in the robbery, and that the defendant had used a similar gun.  493 U.S. at 350.  The Supreme Court held that the prior bad acts evidence did not violate the defendant's due process rights because the jury was free to evaluate the veracity and significance of the evidence, and the judge's limiting instructions served to insure that the evidence was not used for an improper purpose.  Id. at 353.

In his habeas petition, DeLong argues that the prior bad acts, determined by Justice Donovan to be admissible on the issue of identification, combined with an inadequate limiting instruction, were so prejudicial as to have affected his substantive due process rights.  DeLong Mem. at 34-40.

---

[8] "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."  Fed. R. Evid. 404(b).

First, DeLong argues that the prior bad acts evidence ought
not have been admitted at all on the basis that it allowed the
jury to draw negative inferences about his propensity to commit
crime.  DeLong Mem. at 33.  Second, DeLong argues that the
prejudicial effect of the prior bad acts evidence far outweighed
its probative value.  Id.  In his memorandum of law, DeLong
largely adopts the dissenting opinion from DeLong I.  Id. at 34.
There, Justice Berry pointed out that "the evidence concerning
the other three robbery offenses[9] held center stage for 244 of
the 443 pages of the transcript for the Commonwealth's case-in-
chief, consumed fifty percent of the time for introduction of the
prosecution's direct case, and predominated in the exhibits
admitted - of the forty-five exhibits admitted, thirty-one were
from the other robbery offenses."  DeLong I, 60 Mass. App. Ct. at
539 (Berry, J., dissenting).

Justice Berry also noted that the Commonwealth "heralded"
the disproportionate manner in which the prior bad acts would be
introduced in a pre-trial hearing to determine the admissibility
of the other robbery offenses.  There, the prosecutor told the
court: "Essentially, it would be a mini trial on those three.  My
case [the Brighton robbery] would be the smallest part of the
case, and then there would be those other witnesses on the prior
bad acts."  Id. at 539-40.

---

[9] The "robbery offenses" to which Justice Berry refers are
the two robberies at the Newton and Auburndale Star Markets and
the attempted robbery at the Newtonville Star Market.

Justice Berry argued that fundamental unfairness resulted from the ruling on admissibility because in his estimation, the trial judge performed no "judicial weighing of whether the danger of unfair prejudice substantially outweigh[ed] [the bad acts evidence's] probative value." Id. at 540.

The number, and conflation, of in- and out-of-court identifications stemming from the other three robbery offenses also troubled Justice Berry. Id. at 541-42. Justice Berry took issue with the repetitive nature of much of the identification evidence, stating that "the prosecution introduced evidence of the other robbery offenses in duplicate, sometimes triplicate, effect." Id. at 542. She asserted that the out-of-court identification of DeLong made by Sarnie, the witness to the Chestnut Hill robbery, improperly was used to corroborate and validate the out-of-court identification of DeLong's picture in the same photographic spread by a Brighton witness. Id. at 543. Justice Berry also considered the identification evidence offered by Ferrante, the witness to the Auburndale robbery, to be unduly prejudicial. Id. Ferrante made an in-court identification of DeLong as the perpetrator of the Auburndale robbery and testified that he had also identified DeLong in a prior proceeding. Id.

Finally, Justice Berry asserted that the trial justice's "generic and abbreviated instruction" to the jury that they were to "consider the evidence of the robberies at the Chestnut Hill and Auburndale Star Markets 'solely on the limited issue of identification' did not cure the prejudicial and unfair effect."

19

Id. at 544.  Justice Berry criticized the instructions for: (1)
omitting to charge the jury that it could not consider the
defendant's commission of the other robberies as proof that the
defendant had committed the Brighton robbery; (2) omitting the
Newtonville evidence, referring only to the Chestnut Hill and
Auburndale robberies; (3) listing all potential purposes for
admitting prior bad acts evidence, given that the evidence was to
be limited to identification alone; and (4) including an internal
phraseological inconsistency, stating initially in the negative,
and, then in the positive, that the other bad acts were
substantive evidence that DeLong had committed the other
robberies.  Id. at 544 n.5.

    To be sure, the record reveals that a considerable amount of
trial time was devoted to the two prior robberies and the events
surrounding DeLong's arrest at the Newtonville Star Market.  The
proportion of trial time devoted to the prior bad acts evidence,
however, depends in part on which "robbery offenses" are
categorized as prior bad acts evidence.  Justice Berry grouped
all three robbery offenses together, as three prior bad acts
"mini-trials," id. at 540, Justices Brown and Mason viewed only
the two actual robberies as prior bad acts evidence, id. at 533-
34, and considered the Newtonville episode as direct evidence
pertaining to DeLong's arrest.

    The majority held that Justice Donovan properly admitted the
evidence of the two prior robberies because the numerous
similarities demonstrated a distinctive pattern or scheme, thus

warranting admission of the prior robberies for identification purposes. _Id._ at 535. Indeed, the three robberies all occurred at Star Market stores located in close proximity to each other and to DeLong's home. _Id._ The robber, in all three instances, was dressed in dark sweat clothes, covered his head with a hood or soft cap, and wore sunglasses. _Id._ Operating in a quiet and discrete manner, he accosted a victim near the courtesy booth at the front of the store, told a victim in a low voice that he had a gun or a .45 but did not display a weapon, and demanded money be placed in a bag. _Id._

Evidence of the Auburndale and Newtonville robberies was offered purely on the issue of identification. On that basis, its admission - proper both under Massachusetts Guide to Evidence section 404(b) and the cognate Federal Rule of Evidence 404(b) - was not a violation of DeLong's right to due process of law. _See_ _Dowling_, 493 U.S. at 353; _Huddleston_, 485 U.S. at 691. Even more so than in _Dowling_, where admission of the prior bad acts merely strengthened the prosecution's identification of the defendant as the bank robber, here, the prior bad acts and their tendency to identify DeLong as the robber of the Brighton store constituted the heart of the prosecution's case. There was no forensic evidence, no co-conspirator-turned government witness to testify against DeLong, and no equivocal videotape record of DeLong's involvement in the Brighton Star Market robbery.

Further, although the prior bad acts evidence was certainly prejudicial to DeLong, it was not unfairly so. The prior bad

acts evidence was highly probative as to the issue of identification and, as discussed above, the prior bad acts were the prosecution's chief method for proving DeLong was the Brighton robber.

Moreover, this Court is not comfortable adopting DeLong's (and Justice Berry's) assertion that Justice Donovan completely neglected to weigh the prejudicial effect and probative value of the prior bad acts evidence.  A trial justice is not required to articulate and explicate such balancing; it is usually (as here) implicit in the trial record.  See United States v. Griffin, 818 F.2d 97, 101-02 (1st Cir. 1987) (holding that exercise of a district court's informed discretion in weighing probative value and prejudicial effect will be reversed only in exceptional circumstances).

With regard to the jury instruction, while this Court acknowledges it contained inconsistencies, it was not so confusing as to have violated DeLong's due process rights. "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Middleton v. McNeil, 541 U.S. 433, 437 (2004).  "[T]he question is . . . whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973).  "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Id. at 146-47.

Admittedly, Justice Donovan got it backwards when she
instructed, "[s]pecifically, you may use [evidence of the
Chestnut Hill and Auburndale robberies] to conclude that the
defendant committed the other robberies."[10]  Elsewhere in the
charge, however, rather than teaching "[s]pecifically, you may
not use evidence of the other robberies as demonstrating any
propensity to commit the Brighton robbery," Justice Donovan
explicitly instructed the jury that it could "consider [the other
robbery evidence] solely on the limited issue of identification.
You may not consider this evidence for any other purpose."  See
DeLong I,  60 Mass. App. Ct. at 544 n.5.  She reiterated the
proper use of the bad acts evidence, instructing that it was not
evidence "that the defendant has a criminal personality or bad
character," but was admissible for identification purposes and

---

[10] The pertinent part of the jury instruction is as follows:

You've also heard evidence of robberies of the Star
Market at Chestnut Hull [sic] and Auburndale. Let me
explain to you that the defendant is not charged with
those robberies.  As I said, you've heard mention of
those other robberies, and you are not-you may not take
that as substantive proof that [DeLong] committed those
other robberies, nor may you consider it as proof that
the defendant has a criminal personality or bad
character, but you may consider it solely on the limited
issue of identification.  You may not consider this
evidence for any other purpose.  Specifically, you may
use it to conclude that the defendant committed the other
robberies.  This type of evidence is not admissible to
demonstrate the defendant's bad character or propensity
to commit the crimes charged.  But if not too remote in
time, it may be admissible to show motive, opportunity,
state of mind, preparation, plan or scheme, pattern of
conduct, relationship between a defendant and a victim,
knowledge, identification, or absence of mistake or
accident.

DeLong I, 60 Mass. App. Ct. at 544 n.5.

then only if the crimes were "not too remote in time." Id.
Based on the clarity of the jury instructions in toto, Justice
Donovan's misstep cannot be said to have "so infected the entire
trial that the resulting conviction violates due process." Cupp,
414 U.S. at 147. DeLong has therefore not met his burden to show
that the jury instructions prejudiced him to a constitutional
degree.

DeLong has failed to show that he has a valid claim under 28
U.S.C. § 2254(a) on the basis that the admission of the prior bad
acts evidence and the jury instruction violated his due process
rights. Claim 1 of DeLong's petition is denied.

2.   Ineffective Assistance of Counsel

The Constitution guarantees a "fair trial and competent
attorney," Engle v. Isaac, 456 U.S. 107, 134 (1982), not a
"successful defense," United States v. Natanel, 938 F.2d 302, 309
(1st Cir. 1991). "The essence of an ineffective-assistance claim
is that counsel's unprofessional errors so upset the adversarial
balance between defense and prosecution that the trial was
rendered unfair and the verdict rendered suspect." Kimmelman v.
Morrison, 477 U.S. 365, 374-75 (1986).

To prevail on a claim of ineffective assistance of counsel
in violation of the Sixth Amendment, a defendant must demonstrate
both deficient performance of counsel and prejudice resulting
therefrom. Strickland v. Washington, 466 U.S. 668, 687 (1984)

A "deficient" performance is one that is "so inferior as to
be objectively unreasonable." United States v. McGill, 11 F.3d

24

223, 226 (1st Cir. 1993).  An attorney's assistance is ineffective where he "fails to raise an important, obvious defense without any imaginable strategic or tactical reason for the omission." Prou v. United States, 199 F.3d 37, 48 (1st Cir. 1999).

To show the prejudice required for a successful ineffective assistance of counsel claim, "the defendant [must] show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 699.

"Judicial scrutiny of counsel's performance must be highly deferential," id. at 689, and counsel's strategic choices are considered reasonable to the extent that they were based on reasonable investigation by the attorney, id. at 690-91.

> a.    Failure to File a Motion to Suppress Evidence
>        Obtained from the Vehicle Inventory Search
>        (Count B-1)

DeLong Claims that his trial counsel failed to argue that the evidence obtained from his car during the post-arrest inventory search at the Newton police station violated the Fourth Amendment.  DeLong Mem. at 49.

The standard of review of this claim is governed by Kimmelmen v. Morrison, 477 U.S. 365 (1986).  DeLong must "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been

different absent the excludable evidence in order to demonstrate actual prejudice." Id. at 375.

DeLong argues that the police had no legitimate noninvestigatory purpose to tow his car because it was legally parked in a private lot near DeLong's home and his wife or a friend could have driven it home.  DeLong Mem. at 45.  On that basis, he argues that the receipt indicating DeLong had just purchased the clothes he was wearing should have been suppressed as the fruit of the unlawful inventory search.  Id. at 43 n.9.

DeLong's car was parked in a private lot that limited parking to customers of the laundromat and other nearby businesses.  DeLong I, 60 Mass. App. Ct. at 537.  The Appeals Court held that since "private towing was a real possibility if the police did not impound the car, the police could lawfully impound [DeLong's] car."  Id. (citing Commonwealth v. Dunn, 34 Mass. App. Ct. 702, 706 (1993)) ("[T]he police, responsible for pursuing the vehicle to a stop on private property and, by the arrest, leaving it driverless, could reasonably wish to spare the property owner the burden of dealing with the vehicle's presence."); accord United States v. Coccia, 446 F.3d 233, 241 (1st Cir. 2006).

DeLong has not made a showing that a motion to suppress, if made, would have been meritorious.  Because he has not met Kimmelman's first prong, he cannot meet its second, "prejudice" prong.  On that basis, this Court cannot say that the

adjudication of his ineffective assistance of counsel claim was
contrary to, or an unreasonable application of, <u>Kimmelman</u>.

        b.    Failure to Call Additional Alibi Witnesses
            (Count B-2)

At trial, DeLong's defense counsel presented alibi
witnesses for the Brighton, Auburndale, and Chestnut Hill
robberies.[11]  DeLong argues that defense counsel's failure to call
two additional alibi witnesses for the Auburndale robbery
constituted ineffective assistance of counsel.  DeLong Mem. at
50.  DeLong argues that these two witnesses, employees of the
Ground Round restaurant in Waltham, Massachusetts, were crucial
to his defense because they corroborated the testimony of an
interested alibi witness, Ellen DeLong, regarding DeLong's
whereabouts on the evening of January 14, 1998.  <u>Id.</u>
Furthermore, their testimony "might have tended to show" that
DeLong could not have been the individual shown on the videotape
taken at the Brighton store at 8:15 p.m., who wore the same
clothing and had the same physique as the individual shown on the
videotape of the Auburndale robbery occurring later that evening.
<u>Id.</u>

During DeLong's earlier trial in the Middlesex Superior
Court (where DeLong was tried for the Auburndale robbery),
neither restaurant employee unequivocally could testify as to the

---

      [11] DeLong's mother, grandmother, and a family friend were
alibi witnesses for the Brighton robbery.  DeLong Mem. at 23.
DeLong's wife was the alibi witness for the Auburndale robbery.
<u>Id.</u> at 24.  Two additional witnesses testified as to DeLong's
whereabouts during the Chestnut Hill robbery.  <u>Id.</u>

time DeLong and his wife had left the restaurant.  <u>DeLong I</u>, 60
Mass. App. Ct. at 538.  Moreover, DeLong's wife testified that
she had dined with DeLong on the evening of the Auburndale
robbery and had even brought a receipt to the trial at Middlesex
that showed she had paid for dinner at 7:57 p.m. that evening.
<u>Id.</u>

The Massachusetts Appeals Court concluded that the omission
of the two witnesses did not constitute ineffective assistance of
counsel because their testimony was both cumulative and
equivocal, and therefore DeLong was not prejudiced by their
omission.  <u>Id.</u>  <u>Strickland</u> affords defense attorneys considerable
latitude in making tactical decisions.  <u>Strickland</u>, 466 U.S. at
689; <u>see also</u> <u>Knight</u> v. <u>Spencer</u>, 447 F.3d 6, 16-17 (1st Cir.
2006) (holding that it was appropriate for the Supreme Judicial
Court, and then the district court, to conclude that the trial
counsel's decision not to call additional alibi witness,
following six other alibi witnesses, was a tactical one rather
than the result of ineffective assistance).  This Court cannot
say that the Massachusetts Appeals Court decision involved an
unreasonable application of <u>Strickland</u>.  Count B-2 of DeLong's
claim is denied.

> c.   Failure to Challenge Testimony Concerning an
>      Out-of-court Identification (Count B-3)

At trial, Detective Mahoney testified that Beaton, Lamonica,
Lewis, and Wilson identified DeLong from a photographic array.
DeLong Mem. at 55.  Because Wilson did not testify at trial,
DeLong claims his Sixth Amendment right to confront a witness was

violated and that counsel was ineffective for failing to object to the inadmissible hearsay testimony.  Id.

The Massachusetts Appeals Court, noting that Crawford v. Washington, 541 U.S. 36 (2004), does not apply retroactively, acknowledged that Mahoney's testimony regarding Wilson's identification was a violation of the Confrontation Clause. DeLong II, 72 Mass. App. Ct. at 44-45.  It ruled, however, that DeLong was not harmed by the error.  Id. at 45.  The inadmissible hearsay pertaining to Wilson's identification of DeLong was cumulative of the earlier, admissible testimony, even though, as the Appeals Court noted, the three witnesses who did testify as to identification had spent more time with DeLong than had Wilson.  Id.  Applying Strickland, the Appeals Court held that counsel's strategic decision not to object to Detective Mahoney's inadmissible hearsay statement was not "manifestly unreasonable." Id. at 46.

There can be little doubt that Mahoney's testimony as to Wilson's out-of-court identification was inadmissible under the Massachusetts law of evidence.  Commonwealth v. Weichell, 390 Mass. 62, 71-72 (1983) (adopting Proposed Mass. R. Evid. 801(d)(1)(c)); Commonwealth v. Le, 444 Mass. 431, 435-42 (2005) (same; Mass. G. Evid. § 801(d)(1)(c) (same).  Yet, even were this Court to rule that the failure of DeLong's counsel to object to this evidence was "manifestly unreasonable," there was no prejudice here as DeLong makes no showing that, had Wilson been called, he would have failed to identify DeLong.  See Garcia v.

29

Roden, 672 F. Supp. 2d 199, 211 (D. Mass. 2009).   Therefore, this
Court cannot say that the Appeals Court unreasonably applied
Strickland to DeLong's ineffective assistance of counsel claim
pertaining to his right to confrontation.   On that basis, Count
B-3 is denied.

        d.    Failure to Object to the Jury Instruction
             Regarding Witness Identification Testimony
             (Count B-4)

DeLong asserts that defense counsel's failure to object to
the trial judge's omission of an "honest but mistaken"
instruction to the jury constituted ineffective assistance of
counsel.   DeLong Mem. at 67.

Justice Donovan did instruct jurors on determining the
credibility of the witness identifications.   In her instruction,
she informed the jury that identification was an important issue
in the trial and when considering the reliability of witnesses,
jurors should consider whether they had the capacity and
opportunity to make their identifications reliably.   DeLong II,
72 Mass. App. Ct. at 49.

The Massachusetts Appeals Court declined to address the
issue of whether Massachusetts law requires an "honest but
mistaken" instruction in order to pass constitutional muster
because it held, under Strickland's second prong, that the error
had not harmed DeLong.[12]   Id. at 49.   In view of the cross-

_____

    [12] The Appeals Court noted that it is unclear whether the
Supreme Judicial Court's rule in Commonwealth v. Rodriquez, 378
Mass. 296, 301-02 (1979), simply expected trial judges to give an
"honest but mistaken" instruction after its Rodriquez guidance,
or whether, under Commonwealth v. Pressley, 390 Mass 617, 619-20

corroboration of the identification testimony of a number of witnesses, this Court cannot say that the Appeals Court unreasonably applied Strickland.  On that basis, Count B-4 is denied.

> e.   Failure to Pursue Certain Defense Strategies
>      (Counts B-5, 6, 7, 9, 10)

DeLong alleges ineffective assistance of counsel on the basis that trial counsel failed to: (1) investigate or fully exploit deficiencies in the identification testimony of Aleika Lewis; (2) secure a transcript from DeLong's earlier armed robbery trial in Middlesex in order to impeach witnesses; (3) object to the testimony of Detective Anderson, who identified DeLong from still photographs taken from surveillance videotape; (4) investigate or refute evidence pertaining to travel times presented by the Commonwealth; and (5) move to dismiss DeLong's indictment based on the presentation of prejudicial evidence to the Grand Jury.  DeLong Mem. at 74-102, 109-21.

Under Strickland, a "heavy measure of deference" is shown to trial counsel's decision whether to investigate, Strickland, 466 U.S. at 691, and "wide latitude" is afforded to counsel's tactical choices at trial, id. at 689.

First, DeLong claims that defense counsel failed fully to investigate Aleika Lewis's photo array identification and fully to develop the theory of misidentification while cross-examining

---

(1983), they are compelled to do so.  DeLong II, 72 Mass. App. Ct. at 48.  This Court has long read those decisions as requiring such an instruction whenever eyewitness identification is genuinely at issue.

her.  DeLong Mem. at 78, 83.  The Appeals Court noted (and DeLong
acknowledges) that Lewis was cross-examined by counsel on the
issue of identification and clarified that she identified DeLong
in the photographic array while indicating that two other men
whose pictures were in the array looked similar.  DeLong II, 72
Mass. App. Ct. at 49.  It further held that failure to
investigate the men characterized by the witness as similar in
appearance, as trial strategy, did not constitute ineffective
assistance of counsel.  Id.

The Appeals Court held that because the inconsistencies of
various witnesses' statements were explored during cross-
examination, DeLong's counsel was not ineffective for not
obtaining a transcript from the earlier trial in order to impeach
witnesses on alleged prior inconsistent statements.  Id. at 49-
50.

With regard to Detective Anderson, the Appeals Court held
that counsel rightfully could have objected to Anderson's
testimony that DeLong was indeed the man in the surveillance
footage because "[w]hether the photographs were of the defendant
was for the jury, not for a conclusion by a witness."  Id. at 50.
It held, however, that in light of the strength of the properly
admitted identification evidence, this "mildly corroborative"
testimony did not prejudice DeLong.  Id.

The prosecution presented travel time testimony from Detective Anderson in order to refute DeLong's alibi defense.[13] DeLong alleges that failure to investigate travel times or use an available defense witness, John Ryan, to rebut the travel time testimony constituted ineffective assistance of Counsel.[14]   The Appeals Court noted that Ryan's affidavit entered the trial record five years after the trial, and that DeLong had not shown that the information was accurate, that trial counsel was or should have known Ryan had such information, or that counsel's decision was not a "tactical choice."   Id. at 51.

DeLong next asserts ineffective assistance of counsel based on counsel's failure to move to dismiss the indictment because newspaper reports provided to the grand jury violated the rule in

---

[13] Detective Anderson presented travel times and distances between the Chestnut Hill, Brighton, and Auburndale Star markets and the locations of DeLong's two alibis - his work site on Shawmut Avenue in Boston, and the Ground Round restaurant in Waltham.  DeLong Mem. at 110-11.

[14] In his habeas petition, DeLong insists that he does not now, and did not before the Appeals Court, assert that counsel was ineffective for failing to call John Ryan, a witness who had performed a parallel travel time analysis with vastly different results from those of Detective Anderson.  DeLong Mem. at 114. Rather, according to DeLong, counsel was ineffective for failing to **investigate** the travel time and consequently being unprepared to cross-examine Anderson.  Id. (emphasis added).  In fact, in DeLong's memorandum of law in support of his second appeal, he states "[t]estimony from **an available** *witness* would have controverted Detective Anderson's testimony regarding the travel times and distances between the various locations at issue. However, based on counsels' failures, this testimony was never heard by the jury." Commonwealth v. DeLong, 2006 WL 4015657, at *x (emphasis added).  This is the ineffective assistance of counsel claim the Massachusetts Appeals Court analyzed in DeLong's second appeal and therefore, the claim is analyzed here under 28 U.S.C. § 2254(d).

<u>Commonwealth</u> v. <u>Vinnie</u>, 428 Mass. 161, 173-75 (1998), on the basis that they were false or misleading.[15]  DeLong Mem. at 118. The Appeals Court held that defense counsel's decision not to move to dismiss DeLong's indictment on the basis of the media reports was not ineffective assistance of counsel because it would have been a "futile motion" and DeLong was not prejudiced by it.  <u>DeLong II</u>, 72 Mass. App. Ct. at 51; <u>see</u> <u>Commonwealth</u> v. <u>McLeod</u>, 394 Mass. 727, 732 (1985) (Supreme Judicial Court has refused to adopt the federal grand jury requirement that indictments only be returned by unprejudiced juries).

Given the weight of evidence against DeLong, these claimed lacunae cannot be said to "undermine confidence in the outcome" of DeLong's trial and therefore to have prejudiced his defense. <u>Strickland</u>, 466 U.S. at 694.  Here, the strategic decisions whether to investigate were reasonable, and failure to make futile or frivolous motions does not render counsel ineffective. <u>See</u> <u>United States</u> v. <u>Hart</u>, 933 F.2d 80, 83 (1st Cir. 1991); <u>Acha</u> v. <u>United States</u>, 910 F.2d 28, 32 (1st Cir. 1990); <u>see also</u> <u>Genius</u> v. <u>Pepe</u>, 147 F.3d 64, 67 (1st Cir. 1998) (holding that counsel not required to pursue every available defense strategy

---

[15] At trial, Justice Donovan denied DeLong's motion to dismiss the indictment based on the presentation of information to the grand jury that DeLong had been arrested, and was in custody at the time of the grand jury.  DeLong Mem. at 25.
    In fact, the Supreme Judicial Court in <u>Commonwealth</u> v. <u>Vinnie</u> specified that the integrity of the grand jury proceedings was not impaired by inaccuracies that were presented without "knowing or reckless disregard for their truth."  428 Mass. 161, 174 (1998).  DeLong misstates the rule in this case in his brief to this Court.

"until it bears fruit or until all available hope withers." )
(citations omitted).  The Appeals Court did not apply <u>Strickland</u>
unreasonably; therefore, Counts B-5, 6, 7, 9, and 10 are denied.

        f.    Failure to Move to Suppress Identification of
              DeLong Through "Unfair" Photographic Array
              (Count B-8)

DeLong argues that the photographic arrays through which
several witnesses identified him were unreasonably suggestive.
DeLong Mem. at 103.  DeLong asserts that the background color,
position of his image within the frame, and the fact that his was
the only round faced photograph distinguished him in the array.
<u>Id.</u> at 104-05.

The standard of review of this claim is governed by <u>Simmons</u>
v. <u>United States</u>, 390 U.S. 377, 384 (1968).  Under <u>Simmons</u>,
DeLong must show: (1) that the identification procedure was
impermissibly suggestive and (2) that in the totality of the
circumstances, a likelihood of irreparable misidentification
exists.  <u>Id.</u>

The Appeals Court held that an objection to the
identifications from the array would not have succeeded because
the array was not impermissibly suggestive.  <u>DeLong II</u>, 72 Mass.
App. Ct. at 51.  The Appeals Court not only disagreed that
DeLong's "rounded face" distinguished him in the array, but even
if it had, the Appeals Court noted that none of the witnesses
selected DeLong on the basis of this purported "distinctive
feature."  <u>Id.</u> (quoting <u>Commonwealth</u> v. <u>Melvin</u>, 399 Mass. 201,
207 n.10 (1987) (identification from photographic array where

subject has a distinctive feature permissible where witness clearly did not select photograph on that basis)).  The Appeals Court further held that DeLong had not met his high burden under the second prong of Simmons to show a "very substantial likelihood of irreparable misidentification."  DeLong II, 72 Mass. App. Ct. at 51 (quoting Simmons, 390 U.S. at 384).  On that basis, it held that the decision by counsel not to object did not constitute ineffective assistance of counsel.  Id.

Where a photo array has been held not unduly suggestive, a claim for ineffective assistance of counsel for failing to make a "futile" objection cannot lie.  See Vieux v. Pepe, 184 F.3d 59, 64 (1st Cir. 1999) ("[F]ailing to pursue a futile tactic does not amount to constitutional ineffectiveness").  Given DeLong's weak showing regarding distinguishing features, it was not unreasonable for the Appeals Court to hold that the array was not impermissibly suggestive and that DeLong was not prejudiced by a "likelihood of irreparable misidentification."  The Appeals Court did not apply Simmons unreasonably and Count 8 is denied.

**III. CONCLUSION**

None of DeLong's claims establish that a violation of the federal Constitution or laws occurred in his case.  Therefore, DeLong's petition for a writ of habeas corpus is **DENIED.**

SO ORDERED.


By the Court,


36

  /s/ William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE